UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

N<u>o</u> 06-CV-2164 (JFB)(AKT)

---

IRON MOUNTAIN INFORMATION MANAGEMENT, INC.,

Plaintiff,

VERSUS

BEN TADDEO,
MEDIA RECOVERY, INC.,

Defendants.

---

MEMORANDUM AND ORDER
June 30, 2006

---

JOSEPH F. BIANCO, District Judge:

This is a diversity action arising out of an alleged breach of an employment agreement. The plaintiff, Iron Mountain Information Management, Inc. ("Iron Mountain"), seeks a preliminary injunction that would enjoin (1) defendant Ben Taddeo ("Taddeo") from soliciting business from any actual or prospective customer or client of Iron Mountain with which Taddeo had contact during his Iron Mountain employment, and (2) defendants Taddeo and Media Recovery, Inc. ("Media Recovery") from soliciting business from any actual or prospective clients of Iron Mountain or its predecessor, who are known to defendants as a result of information or data known or obtained by Taddeo during his employment with Iron Mountain.

The parties stipulated to a temporary restraining order pending a preliminary injunction hearing. A hearing was held on June 13, 2006, on the motion for a preliminary injunction, and the parties had the opportunity to examine witnesses and submit relevant documentary evidence. Closing statements were heard on June 22, 2006.[1] Having reviewed the submissions and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law, pursuant to Fed. R. Civ.

---

[1] Defendants agreed to continue to be bound by the terms of the temporary restraining order pending this decision.

P. 52(a) and 65, and denies the motion for a preliminary injunction.

I. FINDINGS OF FACT

A. THE PARTIES

Plaintiff Iron Mountain, formerly known as Iron Mountain Records Management, Inc., is a Delaware corporation with its principal place of business in Boston, Massachusetts. Iron Mountain provides Data Protection Services, Data Storage, Electronic Vaulting, and Data Products to its clients. (Preliminary Injunction Hearing Transcript, dated June 13, 2006, at 24 (hereinafter "Tr.")). Defendant Taddeo is an individual who resides in North Babylon, New York. Taddeo became an employee of Iron Mountain in 1998 when it acquired his former employer, Arcus Data Security, Inc. (Tr. at 160.) In 1999, Taddeo became a salesperson with Iron Mountain. (Tr. at 161.) In that capacity, Taddeo sold Data Protection Services, Data Storage, Electronic Vaulting and Data Products. (Tr. at 24.) Defendant Media Recovery is a Texas corporation with its principal place of business in Dallas, Texas. Media Recovery is a competitor of Iron Mountain in the sale of Data Products; it does not offer storage services of any kind and, thus, does not compete with Iron Mountain other than in connection with Data Products. (Tr. at 244, 262.)

B. THE PRODUCTS AND SERVICES

Data Storage and Electronic Vaulting (collectively, "Storage") are both services Iron Mountain offers where it stores its customers' computer backup information in Iron Mountain's own facilities. (Tr. at 24.) With Electronic Vaulting, the customer's backup information is transmitted to Iron Mountain's storage facility over secure phone lines. (Tr. at 25.) For Data Storage, the information is saved onto computer backup tapes at the customer's facility, and Iron Mountain then physically retrieves those tapes and stores them in a secure environment, providing twenty-four hour access. (Tr. at 24.) "Data Products" include a wide array of office supply products, similar to those that are available at a "Staples" or "Office Max." (Tr. at 81.) Virtually every business using computers and possessing a need to backup the information on those computers is a potential Data Products customer. (Tr. at 80-81, 242-43, 245.)

Iron Mountain's customers for Storage services sign contracts that can last for one to three years and the service provided by Iron Mountain recurs on a weekly, monthly or annual basis. (Tr. at 25, 243-44.) As a part of those contracts, Iron Mountain's Storage services customers face a monetary penalty if they choose to terminate the contract before the expiration of its term. (Tr. at 244.) In contrast, sales for Data Products are one-time, low-margin sales, and each new sale requires a new order from the customer. (Tr. at 25.) Data Products customers do not sign contracts with Iron Mountain and typically would call Iron Mountain to request a quote and would compare those prices by shopping around with other vendors. (Tr. at 245-46, 255-56.) Data Products are similar to commodities in that the price fluctuates. (Tr. at 78, 132-33.) The pricing information on Iron Mountain's cost sheets, which are available on its intranet, change about every two weeks. (Tr. at 251.)

As a sales representative for Iron Mountain, Taddeo used a number of methods to locate and contact prospective customers for Data Products, including local trade publications that publish lists of top accounting firms, law firms, and other public and private companies on Long Island,

2

Hoover's online, Crain's, and other commercially available publications. (Tr. at 164-65, 242-45.) Other customers contacted Iron Mountain's telemarketing department directly, some were existing customers and Taddeo simply "cold-called" others. (Tr. at 164, 166-67.) In addition to these outlets for information, Taddeo implemented his own marketing methods in which he sent out reminder e-mails to customers and ran occasional price specials. (Tr. at 129.) According to one of Taddeo's supervisors, John Connors (Executive Vice-President for North American Sales and Marketing for Iron Mountain), Taddeo was "almost running his own business" with respect to marketing and selling Data Products to prospective customers. (*Id.*)

To sell Data Products to a prospective customer, Taddeo would call the customer's general telephone number and ask to speak with an employee in the information technology department or someone ultimately responsible for purchasing Data Products. (Tr. at 252-53.) It generally took Taddeo one or two phone calls to find the right person. (Tr. at 254.) Taddeo would then inquire about the customer's Data Products needs and solicit orders accordingly. (*Id.*) To the extent the customer had any specific preferences for Data Products, Taddeo would obtain that information by asking a direct question or as a result of the customer volunteering such information. (Tr. at 254.) This prospecting conversation could take place in one to two minutes. (Tr. at 253-54.)

At the time of the relevant events in early 2006, Iron Mountain's goal was to change the focus of the sales representatives from Data Products to the higher margin, core services. (Tr. at 43, 70.)

## C. THE EMPLOYEE HANDBOOK

On November 16, 2003, Taddeo signed an Employee Acknowledgment Form, acknowledging acceptance of Iron Mountain's Employee Handbook revised January 1, 2003. (Stipulated Facts For Preliminary Injunction Hearing dated June 12, 2006 (hereinafter "Stip.") ¶ 3.) The Employee Handbook prohibited employees from disclosing "to any person the identity of any Iron Mountain customer except to carry out Iron Mountain's obligation with respect to such customer." (Pl. Ex. 2.) The Employee Handbook also provided that "[a]ll customer and employee information shall be treated as confidential and proprietary" and it restricted employees from "simultaneous employment with a . . . competitor." (*Id.*)

## D. THE CONFIDENTIALITY AND NON-COMPETE AGREEMENT

During his employment, Taddeo was required to execute Employee Confidentiality and Non-Competition Agreements with Iron Mountain, in conjunction with changes to his compensation plan. (Tr. at 31-33.) The most recent agreement was executed by Taddeo in December 2004 in conjunction with the 2005 Compensation Plan (the "2004 Agreement"). (Tr. at 32-33; *see also* Stip. ¶ 5.) The 2004 Agreement had a confidentiality provision, a non-competition provision, and a non-solicitation provision. (Pl. Ex. 3) The 2004 Agreement's non-competition provision prevented Taddeo from accepting employment with any competitor within a 50-mile radius of any Iron Mountain facility for one year following his termination from Iron Mountain.[2] (*Id.*) The non-solicitation

---

[2] Iron Mountain is not seeking to enforce this particular provision of the agreement.

3

provision prevented Taddeo from soliciting business from any actual or prospective customers of Iron Mountain with whom he had contact during his employment at Iron Mountain for one year following his termination from Iron Mountain. (*Id.*)

On January 6, 2006, Taddeo's supervisor presented Taddeo with Iron Mountain's 2006 Sales Compensation Plan and another Employee Confidentiality and Non-Competition Agreement in connection with the introduction of the 2006 Compensation Plan (the "2006 Agreement"). (Tr. at 31-32, Stip. ¶ 6.) Execution of the 2006 Agreement was a requirement before Taddeo could receive compensation under the 2006 Compensation Plan. (Tr. at 179-80.) The 2006 Compensation Plan differed from the 2005 Compensation Plan. (Tr. at 58.) First, the 2006 Compensation Plan contained a monthly limit on the commission Taddeo could earn on the sale of Storage services. (Tr. at 59.) In addition, whereas Taddeo had previously received commissions on any sale of Data Products, the new plan cut off those commissions 90 days after the customer placed its first order for Data Products. (Tr. at 58-59.) The 2005 Compensation Plan did not contain these restrictions. (Tr. at 58.)

Taddeo refused to sign the 2006 Agreement, citing the concerns he had regarding the impact of the 2006 Compensation Plan on his income. (Tr. at 32, 64-65, 180.) On January 13, 2006, Taddeo executed an affirmation that he "received, read and understand [sic] the 2006 Sales Plan Memorandum and the 2006 Sales Compensation Plan." (Stip. ¶ 8.) However, Taddeo did not sign the Employee Confidentiality and Non-Compete Agreement that Iron Mountain had presented to him in connection with the 2006 Plan. (Stip. ¶ 9.) Taddeo's supervisor made several inquiries with Taddeo regarding his failure to sign the Non-Compete Agreement. (Tr. 180, Pl. Ex. 16.) On January 17, 2006, Taddeo responded by e-mail to one of these inquiries, to his supervisor, that he sent the 2006 Agreement to his attorneys for review and that he would have a response in "a week or so." (Tr. 182, 189, Pl. Ex. 16.) His supervisor followed-up approximately one week later, on January 30, 2006, and Taddeo assured him that he would have something "today to review." (Pl. Ex. 23.) Taddeo never provided any attorney comments to the 2006 Agreement and he never signed the new agreement. (Tr. at 185.) Instead, Taddeo began to seek other employment. (Tr. at 32, 180, 191-92.) On February 13, 2006, Taddeo signed an Employment Agreement with defendant Media Recovery. (Stip. ¶ 10, Pl. Ex. 30.)

On March 1, 2006, John Conners called Taddeo to "gauge his status and attitude" to decide whether to pay Taddeo his January 2006 commissions, despite Taddeo's failure to sign the 2006 Agreement. (Tr. at 119.) Iron Mountain decided to pay Taddeo. (Tr. at 120.) However, on March 2, 2006, Iron Mountain's director of human resources sent Taddeo a letter stating that Taddeo had an obligation to execute the most recent Confidentiality and Non-Competition Agreement.[3] (Tr. at 120, Pl. Ex. 51.) On March 13, 2006, Iron Mountain flew Taddeo to Boston to meet with John Conners and discuss his concerns about the 2006 Compensation Plan. (Stip. ¶ 13.) On March 17, 2006, Conners authorized the payment of Taddeo's February commissions to avoid being "heavy handed" in negotiations. (Def. Ex. J.)

---

[3] Several of Iron Mountain's executive-level employees got involved with the task of getting Taddeo to sign the 2006 Agreement. (Tr. at 63-66.)

4

On April 21, 2006, Taddeo provided two-weeks' written notice of his resignation, making May 5, 2006, his last day of employment with Iron Mountain. (Tr. at 88, Pl. Ex. 93, Stip. ¶ 15.) On May 3, 2006, Taddeo blind copied his supervisor on an e-mail, announcing his resignation and new employment relationship with Media Recovery. (Stip. ¶ 17.)

### E. TADDEO'S ACTIONS WHILE STILL EMPLOYED AT IRON MOUNTAIN

Subsequent to April 21, 2006, when Taddeo tendered his resignation and informed Iron Mountain he was leaving, Taddeo engaged in conduct inconsistent with his obligations as an Iron Mountain employee by, *inter alia,* diverting Iron Mountain Data Product orders to Media recovery. (Tr. at 209-35.) A summary of Taddeo's actions, during that two-week period prior to his termination, are described below.

On April 25, 2006, while still employed with Iron Mountain, Taddeo sent an e-mail to a customer service representative for Media Recovery asking her to quote a specific price for a brand and type of computer backup tapes for American Home Mortgage, one of Taddeo's customers. (Tr. at 210-12, Pl. Ex. 99.) Taddeo also stated that the price he wanted to bid was several dollars less than the price he had recently charged the same customer on a sale made on Iron Mountain's behalf. (Tr. at 209-12.) Taddeo ultimately placed that order through Media Recovery. (Tr. at 216.)

On May 2, 2006, again, while still employed with Iron Mountain, Taddeo sent another e-mail to the same customer service representative for Media Recovery to obtain a price quote on computer "motherboards" and hard drives. (Tr. at 218-20.) The request for this order originally came to Taddeo's Iron Mountain address on April 17, 2006, from a customer at Hughes, Hubbard & Reed. (Tr. at 217.) Taddeo ultimately quoted this customer a price from his Media Recovery email, that was less than the price he had quoted for the same products through Iron Mountain roughly two weeks earlier, when the request came in. (Tr. at 218-21.) In a subsequent e-mail, Taddeo quoted a price to the same customer to purchase a laptop through Media Recovery and told the customer that it was about $300 cheaper than the price the customer had recently paid to Iron Mountain. (Tr. at 221-22.) Without permission, Taddeo set-up an email account with the address, ironmountain@optonline.net, to provide this quote. (Tr. at 222.)

On May 3, 2006, Taddeo sent another e-mail to the same Media Recovery customer service representative asking that she try to obtain "bid pricing" for a specific brand and type of computer backup tapes for Computer Associates, another of Taddeo's customers. (Tr. at 226.) In that same e-mail, Taddeo indicated that Iron Mountain had obtained "bid pricing" for this customer and product in the past. (*Id.*) A "bid pricing" arrangement is done when a particular customer is making a large purchase, and the arrangement is one whereby the intermediary vendor of data products works directly with the manufacturer to secure a more favorable price. (Tr. at 126.) "Bid pricing" is known as a common industry practice in the sale of Data Products. (Tr. at 127, 130.) Taddeo never communicated the specific bid price to the customer service representative for Media Recovery, nor retained any information that would contain that price. (Tr. at 270, 241, Pl. Ex. 101.)

On May 3, 2006, Taddeo sent another e-mail to the same customer service representative at Media Recovery to obtain a

price quote on a specific brand and type of computer backup tape for DOAR Communications, another one of Taddeo's customers from Iron Mountain. (Tr. at 228-229, Pl. Ex. 127.) Taddeo initially received that request for a price quote in his employment with Iron Mountain. (Tr. at 230.) Media Recovery did not ultimately make a sale to DOAR Communications based on this price quote. (Tr. at 271.)

Also on May 3, 2006, Taddeo sent an e-mail to his customer contact at Proskauer Rose LLP regarding his new employment with Media Recovery and suggested that he would be able to continue serving that customer through Media Recovery. (Tr. at 232-23; Pl. Ex. 142.) When the customer asked if pending orders placed through Iron Mountain should be canceled, Taddeo responded: "I would recommend canceling the remaining orders regardless of what vendor you decide to go with simply because Iron [Mountain] is demonstrating that they are moving away from this business. . . ." (Tr. at 235; Pl. Ex. 142.)

Lastly, on May 3, 2006, Taddeo sent an e-mail to roughly 1,500 e-mail addresses announcing his resignation from his employment with Iron Mountain. (Tr. at 53, Pl. Ex. 115.) In that e-mail, Taddeo announced that he would be leaving Iron Mountain's employment to go work for Media Recovery and provided his new contact information. (Tr. at 55.) Taddeo sent the e-mail to addresses that were contained in his Microsoft Outlook Contacts folder.[4] (Tr. at 257.) When Iron Mountain learned that Taddeo had sent this last e-mail, it terminated Taddeo's employment in a meeting on May 4, 2006. (Tr. at 239.) Prior to leaving, Taddeo was asked to return his laptop and his ID. (Tr. at 260.) Taddeo had erased the contents of the My Documents folder prior to turning in the computer because it contained some personal documents. (Tr. at 261-62.) Also, as emails came into Outlook, Taddeo had placed them into the deleted items box. (Tr. at 261.)

II. CONCLUSIONS OF LAW

A. JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because of the complete diversity of the parties. The amount in controversy exceeds $75,000, exclusive of interests and costs. Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2) because the defendants reside in this District and a substantial part of the events giving rise to the claims occurred in this District.

B. CHOICE OF LAW

The Court finds, and the parties agree, that New York's substantive law controls, except that issues relating to the "validity, interpretation and performance" of the contractual restrictive covenants between Iron Mountain and Taddeo are governed by Massachusetts law, based on the parties' contractual choice of law provision. *See S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1025 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 990 (2d Cir. 1985); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) ("New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the

---

[4] Some of the addresses to which the e-mail was sent were no longer valid and were returned to Taddeo's account as "undeliverable". (Tr. at 150.)

6

transaction.") (internal quotations and alterations omitted).

C. PRELIMINARY INJUNCTION STANDARD

"The preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Grand River Enters. Six Nations v. Pryor*, No. 02-CV-5068 (JFK), 2006 U.S. Dist. LEXIS 35614, at *16 (S.D.N.Y. June 1, 2006) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)). In order to prevail on a motion for a preliminary injunction, a party must establish: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quoting *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)). "To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989) (internal quotations omitted). A preliminary injunction is not appropriate where monetary damages will serve as adequate compensation. *Id.* "The law in this circuit requires a showing that irreparable damages are likely, not merely possible." *Goldblatt v. Englander Communs., LLC*, No. 06-CV-3208 (RWS), 2006 U.S. Dist. LEXIS 29443, at *10-11 (S.D.N.Y. May 16, 2006).

D. LIKELIHOOD OF SUCCESS ON THE MERITS

1. FAILURE TO DEMONSTRATE THAT THE RESTRICTIVE COVENANT IS ENFORCEABLE UNDER MASSACHUSETTS LAW

The Court concludes that Iron Mountain has failed to demonstrate that it is likely to succeed in connection with the enforcement of Taddeo's 2004 Confidentiality and Non-Competition Agreement. Under Massachusetts law, the 2004 Agreement is void if the 2006 Compensation Plan constituted a material change in the employment relationship such that Iron Mountain and Taddeo entered into a new employment relationship. As set forth below, although whether there was a material change in the employment relationship is a disputed issue, the Court finds that there is strong evidence to suggest that a material, negative change did occur to Taddeo's compensation in 2006, such that the 2004 Agreement was voided.

It is well-settled under Massachusetts law that "[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." *Lycos, Inc. v. Jackson*, No. 2004-3009, 18 Mass. L. Rep. 256, 2004 Mass. Super. LEXIS 348, at *9 (Mass. Super. Ct. Aug. 25, 2004); *see also Cypress Group, Inc. v. Stride & Assocs., Inc.*, 17 Mass. L. Rptr. 436, 2004 WL 616302 (Mass. Super. Ct. February 11, 2004) (same). This legal principle is articulated in *F.A. Bartlett Tree Expert Co. v. Barrington*, 233 N.E.2d 756 (Mass. 1968), where the Massachusetts Supreme Court voided an employment agreement containing a restrictive covenant because there were subsequent changes in the defendant's employment that changed the employment

7

relationship. In particular, the Court noted that "the defendant's rate of compensation and sales area were changed" and "[s]uch far reaching changes strongly suggest that the parties had abandoned their old arrangement and had entered into a new relationship." *Id.* at 587.

Applying *F.A. Bartlett,* Massachusetts courts have consistently refused to grant injunctive relief or otherwise enforce restrictive covenants where such covenants were entered prior to changes in the employment relationship. *See, e.g., Lycos, Inc.,* 2004 Mass Super. LEXIS 348, at \*10 (denying injunctive relief for enforcement of non-compete agreement finding that "[b]ecause a material change in the employment relationship between [defendant] and [plaintiff] voided the previous Agreement, and because defendant did not sign the Offer Letter incorporating the old Agreement, no written nondisclosure, noncompetition and developments agreement now exists between the parties"); *R.E. Moulton, Inc. v. Lee*, No. 04-933, 18 Mass. L. Rep. 157, 2004 Mass. Super. LEXIS 268, at \*2-3 (Mass. Super. Ct. June 17, 2004) (denying request for a preliminary injunction based on a non-compete agreement where employee's position and compensation changed, but no new agreement was signed and the employer did not notify the employee that he was still subject to the non-compete clause); *Cypress Group, Inc. v. Stride & Assocs., Inc.*, 03-6070-BLS2, 2004 Mass. Super. LEXIS 69 (Mass. Super. Ct. February 11, 2004) (motion for preliminary injunction seeking enforcement of restrictive covenant denied because employees did not sign new restrictive covenant after their promotions to new positions at company); *see also AFC Cable Systems Inc. v. Clisham*, 62 F. Supp.2d 167, 172-73 (D. Mass. 1999) (granting summary judgment for former employee in action alleging breach of non-compete agreement because the non-compete agreement was voided by change in employee's title and pay structure when he went from "sales consultant" to "sales manager").

In determining whether there has been a material change to the employment relationship, courts have considered it extremely significant that the employer sought to have the employee sign a new non-compete agreement. For example, in *AFC Cable,* the United States District Court for the District of Massachusetts held that, under *F.A. Bartlett*, a material change in the employment relationship coupled with the employers "repeated efforts to have [the employee] sign a new non-complete agreement" voided the prior agreement. *AFC Cable Sys. v. Clisham,* 62 F. Supp. 2d 167, 173 (D. Mass. 1999). In particular, the court noted:

> That [the employer] wanted the protections of a non-compete agreement is manifest from its actions. [The employer], however, never obtained one. While [the employer] was free to terminate [the employee] for his refusal to sign a new Agreement, it chose instead to drop the subject and hope for the best.

*Id.*; *see also Lycos,* 2004 Mass. Super. LEXIS 348, at \*10 ("[Plaintiff] requested that [defendant] sign the Offer Letter demonstrating her acceptance of the Agreement, thus implicitly acknowledging a material change in their relationship such that a new employment contract and non-disclosure, noncompetition and developments agreement are necessary."). This Court is aware of no case under Massachusetts law where, despite a material change in employment terms coupled with an employee's refusal to sign a new covenant at

8

employer's request, a court has nevertheless upheld a restrictive covenant executed prior to the change in employment terms.

In the instant case, although Iron Mountain tries to argue that there is no material change in the employment relationship, there is strong evidence in the record to suggest otherwise. First, the 2006 Compensation Plan contained a monthly limit on the commission Taddeo could earn on the sale of Storage services. (Tr. at 59.) In addition, whereas Taddeo had previously received commissions on any sale of Data Products, the new plan cut off those commissions 90 days after the customer placed its first order for Data Products. (Tr. at 58-59.) The 2005 Compensation Plan did not contain any of these restrictions. (Tr. at 58.) These changes were obviously significant. Second, Iron Mountain made persistent efforts to try and make Taddeo sign the 2006 Confidentiality and Non-Competition Agreement. (Tr. at 180) Specifically, although the execution of the other agreement was a requirement before Taddeo could receive compensation under the 2006 Compensation Plan, Taddeo refused to sign the 2006 Agreement because of concerns about the effect of the 2006 Compensation Plan on his income, but he did sign the Compensation Plan. Iron Mountain's representatives repeatedly approached Taddeo after this initial refusal in an attempt to sign the 2006 Agreement, but he never signed the agreement. Under Massachusetts law, such efforts constitute additional proof that a new employment relationship was forming as a result of the 2006 Compensation Plan.[5]

---

[5] In fact, Iron Mountain's Group President over its North American Delivery Services testified that the reason Iron Mountain required employees to execute new agreements with promotions and compensation changes was to ensure that the agreements would be enforceable under Massachusetts law. (Ebbigshausen Dep. at 12-15).

Iron Mountain attempts to distinguish *F.A. Bartlett* and *AFC Cable* on several grounds by arguing the following: (1) unlike in *F.A. Bartlett*, Iron Mountain never abandoned its effort to procure Taddeo's signature on the non-competition agreement, but rather was engaged in ongoing discussions over a period of months in the first half of 2006; (2) Taddeo fraudulently induced Iron Mountain to maintain his employment status and to pay him, with false assurances that he was negotiating in good faith; (3) Iron Mountain expressly reserved its rights in paying Taddeo incentive compensation, reaffirming that Taddeo must sign the restrictive covenant; (4) the prior agreements signed by Taddeo provided that no changes in his duties or position with Iron Mountain would affect his obligations under the prior restrictive covenants, which Taddeo did sign; and (5) defendants submitted no evidence establishing that Taddeo made less under the 2006 Sales Compensation Plan that he would have made under the prior plan. As set forth below, the Court finds these arguments unpersuasive.

First, although evidence that the employer has abandoned efforts to have the employee sign a new restrictive covenant would obviously provide additional proof that an agreement had been voided by mutual consent, such evidence is clearly not *required* under Massachusetts law to void a restrictive covenant. Instead, as noted above, Massachusetts courts have clearly held that what is required to void such an agreement is a material change in the employment relationship such that a new employment relationship is formed. Substantial evidence exists in the instant case, for the reasons set forth above, to suggest that such a material

change in the employment relationship occurred when Iron Mountain implemented the 2006 Compensation Plan. If the employment relationship changes, then the prior agreement is void regardless of how many times the employer attempts to go back to the employee and get him or her to sign the new agreement. An employer cannot immunize itself from voiding the prior agreement, in the wake of a new employment relationship, simply by renewing unsuccessful efforts every few weeks or months to have the employee sign the new restrictive covenant. In other words, if there is evidence of a material change in the employment relationship (such as new compensation terms) and a refusal by the employee to sign a new covenant at the employer's request, the exact length of the employee's continued employment with the company after such change is not critical because the prior agreement has already been voided. This point was illustrated in *Lycos v. Jackson* in which the court refused to enforce a prior non-compete agreement where defendant was promoted to Senior Product Manager in March 2004, then refused to sign and return the Offer Letter regarding promotion which referenced her previous agreement, and resigned shortly thereafter in July 2004. *Lycos*, 2004 Mass. Super. LEXIS 348, at *9-10; *see also AFC Cable Systems Inc.*, 62 F. Supp. 2d at 173 (finding that the focus under *F.A. Bartlett* is the change in employment relationship, not how much time went by between the signing of the restrictive covenant and the attempt to enforce it). The factual circumstances regarding the timing in *Lycos* are substantially similar to the time frame in the instant case. Thus, even if Iron Mountain hoped that Taddeo would eventually sign the new restrictive covenant, the fact that they had not abandoned all hope on that issue would not save the prior agreement where a material change to the employment relationship had already voided that agreement.[6]

Iron Mountain's second argument, that their ongoing negotiations with Taddeo regarding his 2006 Compensation Plan prevented the prior 2004 Confidentiality and Non-Competition Agreement from being voided, is similarly flawed. The current factual record establishes (1) that there were significant changes to Taddeo's compensation plan in 2006, and (2) that he signed the compensation plan, but refused to sign the new non-competition agreement that Iron Mountain submitted to him with his new compensation plan. Thus, if the new compensation plan materially changed the employment relationship and voided the prior non-compete agreement, the existence of a dialogue regarding potential modifications to the compensation plan does not resurrect that prior non-compete agreement. To the extent that Iron Mountain is attempting to argue that the ongoing compensation dialogue provides proof that the employment relationship had not yet even changed and that the parties still believed they were bound during these negotiations by the 2004 Agreement, that argument is strongly controverted by the fact that the new compensation plan was already signed during these negotiations and Taddeo had refused to sign a new non-compete agreement.

---

[6] Iron Mountain relies on *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420 (D. Conn. 2004), but that case is factually distinguishable. Specifically, in that case, the court found that, even though the employee had been promoted, there was no evidence that the employee was performing a materially different function and, thus, there was no basis to void the existing employment agreement. *Id.* at 424-25.

For the same reason, the fact that Iron Mountain attempted to reserve its rights while providing compensation to Taddeo in early 2006 does not have any legal significance. More specifically, if the 2004 agreement had already been voided by the 2006 Compensation Plan and Taddeo's subsequent refusal to sign the 2006 non-compete agreement, Iron Mountain had no ability to reserve its rights under a voided contract. If Iron Mountain seeks to argue that such a reservation of rights indicates some intent by the parties to continue to be bound by the 2004 Non-Compete Agreement, the Court does not believe that this evidence provides any basis to conclude, in light of the other evidence, that Taddeo was agreeing to continue to be bound by the 2004 Agreement at that juncture.[7]

With respect to Iron Mountain's fourth argument, the Court concludes that the provision in the 2004 Agreement – which states that the Agreement is still binding even if his duties or positions changed – cannot provide an independent basis, in the face of *F.A. Bartlett* and its progeny, to save that agreement under the circumstances of the instant case. As a threshold matter, the changes at issue here were not changes in "duties" or "position," but rather were changes in *compensation*. Thus, by its plain language, this provision is simply inapplicable to the current situation. In any event, even if the provision said that the employee was bound even if there were subsequent changes in compensation, it is not entirely clear that such a provision could be upheld under Massachusetts law because it was the compensation plan that provided the consideration for the 2004 Agreement to be valid in the first place.

Finally, Iron Mountain argues that defendants have submitted no evidence to suggest that Taddeo made less under the 2006 Compensation Plan than under prior plans. However, as noted above, the Court finds that there is strong evidence on the face of the new terms to suggest that they would have a material impact on Taddeo's compensation. This is further buttressed by testimony from Taddeo that it would have such an impact, as well as Iron Mountain's internal discussions about increasing the compensation plan to address Taddeo's concerns. (Tr. at 45, 48, 174-176.) Since Taddeo only worked at Iron Mountain for the first four months of 2006, there are no actual numbers for 2006 that can contradict this strong evidence of material changes to his compensation. Although Iron Mountain noted that Taddeo's compensation for the first few months of 2006 was similar to his compensation in prior years, that argument has no significance where the drastic

---

[7] Iron Mountain argued at the hearing that, if Massachusetts law is interpreted as to void the prior restrictive covenant even if negotiations are continuing with the employee regarding his or her unwillingness to sign a new covenant, it will place employers in the untenable position of having to immediately terminate their employees as soon as they refuse to sign a new restrictive covenant in order to preserve the validity of the old agreement. That is simply not the case. As long as an employer does not change the existing employment relationship, then the prior restrictive covenant will remain in place during any such negotiations over the proposed change in the employment relationship. The key fact here is that Iron Mountain chose to make the changes to Taddeo's compensation even after he refused to sign the new covenant. In other words, Iron Mountain could have avoided the current situation by either (1) keeping the 2005 Compensation Plan in place as to Taddeo until he signed the new non-compete covenant, or (2) reaching an agreement with Taddeo in which he agreed to be bound by the 2004 Agreement while negotiations about modifications to his 2006 compensation continued. Iron Mountain did neither.

reduction in Taddeo's compensation was expected to occur *after the first 90 days* of 2006 because that is when specific restrictions would be placed on his ability to earn additional commissions. In short, there is no evidence in the record that undermines what appears to be apparent from the terms of the compensation plan and the testimony of Taddeo – that the 2006 Compensation Plan contained material changes to Taddeo's compensation.

Accordingly, the Court finds that there is substantial evidence in the record to support that there was a material change in the employment relationship that voided the 2004 restrictive covenant under Massachusetts law. Accordingly, Iron Mountain has not demonstrated a likelihood of success on the merits in connection with the enforcement of that covenant.

### 2. FAILURE TO DEMONSTRATE THAT THE CUSTOMER LIST AND APRIL BOOKINGS REPORT ARE TRADE SECRETS

"[A]bsent a covenant not to compete, an employee is free to compete with his or her former employer unless trade secrets are involved or fraudulent methods employed." *Catalogue Service of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784 (N.Y. App. Div. 1985). Therefore, because the Court found substantial evidence to suggest that the restrictive covenant became void afer the material change in the employment relationship, the Court will now turn to the likelihood of success on the merits as to whether Iron Mountain can demonstrate that Taddeo misappropriated a trade secret.

The information at issue is the April 2006 Bookings Report and Taddeo's Outlook Contacts.[8] Taddeo testified that he currently possesses only the Outlook Contacts; he no longer has the April Bookings Report. (Tr. at 241; 264.) The only evidence with respect to the Outlook Contacts list is that it presumably includes the roughly 1500 e-mail addresses that were included on Taddeo's departure email.[9] The April Bookings Report is a list of customers who purchased off-site data protection services from Iron Mountain in the month of April. (Tr. 75, 97-98; Pl. Ex. 112.) The report does not contain any contact information, and though Iron Mountain maintains the list could be used to identify prospective Data Products customers, the report did not contain names of customers who purchased Data Products in the month of April. (*Id.*) The report is typically sent to sales representatives to verify whether all the sales they made have been recorded, so the sales representatives could verify that they were receiving all commissions they were due. (Tr. at 74.) This list was emailed to Taddeo after he announced his resignation. (Tr. at 74-75.) Taddeo then emailed the list to both his home email account and his Media Recovery account so that he could compare the commissions he was due for the accounts that he booked in April. (Tr. 75, 97-98, 263; Pl. Ex. 112). Taddeo had not yet been paid

---

[8] Iron Mountain also alleges that its supplier cost information and pricing information are trade secrets. However, there is no evidence that Taddeo has any pricing information or cost information in his possession. Furthermore, the testimony made clear that the pricing information changes every two weeks, voiding the relevance of any information Taddeo might have possessed when he left Iron Mountain's employment in early May.

[9] Iron Mountain did not submit additional evidence or elicit testimony on the exact contents of the Outlook List it seeks to protect as trade secret.

12

for the April accounts when he forwarded the April Bookings List. (Tr. at 263.) Taddeo testified that he kept the April Bookings List for no other reason than to calculate his commissions and that he did not use the document as a tool to identify prospective customers. (*Id.*) There was also no evidence that Taddeo or Media Recovery currently has possession of the April Bookings Report.

The Court finds that Iron Mountain has failed to establish a likelihood of success on the merits in demonstrating that either the April Bookings List or the Outlook Contacts are entitled to trade secret protection. In determining whether information qualifies as a trade secret, New York courts have considered the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quoting Restatement of Torts § 757 cmt. b) (internal quotation marks and brackets omitted). "[C]ustomer lists are generally not considered confidential information." *H. Meer Dental Supply Co. v. Commisso*, 269 A.D.2d 662, 664 (N.Y. App. Div. 2000). However, "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not readily ascertainable." *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985); *accord Leo Silfen, Inc. v. Cream*, 328 N.Y.S.2d 423, 427-29 (N.Y. 1972).

Iron Mountain primarily relies on *Velo-Blind, Inc. v. Scheck,* 485 F. Supp. 102 (S.D.N.Y. 1979) and *Webcraft Technologies v. McCaw*, *Inc.*, 674 F. Supp. 1039 (S.D.N.Y. 1987), to support its position that the April Bookings List and Outlook Contact list are subject to trade secret protection. Those two cases, however, dealt with a very different type of product than what we have in the present action. In *Velo-Blind*, for example, the product involved was a patented machine, and the court in that case found that "[t]he essential economics of the Velo-Blind business is to sell basic binding machines for the purpose of obtaining ready-made customers for the repeat sales of consumable binding supplies used in conjunction with such machines." *Velo-Blind*, 485 F. Supp. at 103. The customer list at issue "consisted exclusively of owners of Velo-Blind machines," and, as the court pointed out, while "their names might appear in publicly available directories, they were nowhere denominated as Velo-Blind machine owners except on the customer lists maintained by Velo-Blind, itself and its two authorized distributors." *Id.* at 107.

Likewise, in *Webcraft*, the plaintiff sold unusual in-line finishing products. *See Webcraft Technologies*, 674 F. Supp. at 1045. The court found that, "[a]lthough it may be self-evident that Company A is a prospective customer for any seller of printing services . . . [t]he evidence shows it is a long, difficult process to educate and convert a prospective

customer to the benefits of the process." *Id.* at 1045.

Here, however, any company with a computer and a need to back-up information is a potential customer of Data Products. (Tr. at 80-81.) The product is not one, such as in *Velo-Blind* or *Webcraft,* where a company's availability as a potential patron cannot be readily ascertained. The potential list of Data Products customers is not limited in such a way that any list of prior Data Products purchasers is a trade secret.

Similar to the customers at issue in *Silfen*, Iron Mountain's "customers were readily ascertainable as likely prospects." The Court finds the facts in this case closely analogous to those in *Candler Coffee Corp. v. Eigenfeld*, 432 N.Y.S.2d 816, *aff'd*, 448 N.Y.S.2d 435 (N.Y. App. Div. 1st Dep't 1982). The plaintiff in *Candler* was one of approximately 15-20 large coffee services firms that provided coffee machines, coffee, paper goods and other snack items to businesses in the city. *Id.* at 817. The defendants were salespersons who left Candler and went to work for a competitor. One defendant maintained a notebook containing names of customers that he solicited and serviced both before and during his employment with plaintiff. *Id.* at 817-18. The notebook also had some pricing information on customers which defendant had used at his new employment to procure customers. *Id.* at 818. The Court in *Candler* held that the customer names were not a trade secret, emphasizing the standard role of the salesman in gaining accounts in a competitive industry. *Id.* at 819. More specifically, the court found:

> [T]his salesman defendant appears to be no different than any other salesman in numerous competitive industries where commission salesman, as quasi-independent operators, move from employer to employer, and solicit business from customer lists, open locations and sources developed through their efforts and personality. To bar such a salesman from selling to such former customers in a new employment (where no clear equitable or contractual impediment exists) would severely impede or utterly destroy the ability of the employee to earn a livelihood.

*Id.* Here, the Executive Vice-President for North American Sales and Marketing for Iron Mountain testified that Taddeo was "almost running his own business" over the years at Iron Mountain with respect to marketing and selling Data Products to prospective customers. (Tr. at 129.) This demonstrates that the accumulation of contacts was significantly a result of Taddeo's own efforts and the customers were readily ascertainable through cold calls and industry publications. *See Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 156 (E.D.N.Y. 1986) ("the ease or difficulty with which the information could be properly acquired or duplicated . . . in almost all instances . . . [will] be the most significant [factor]").

There is no indication in the record that Taddeo's Outlook Contacts includes customers other than those pursued by Taddeo and there is no evidence that Taddeo took or copied the contact lists of other Iron Mountain salespersons. Numerous courts have found that employee lists did not qualify as a trade secret under similar circumstances. *See, e.g., Bijan Designer for Men v. Katzman,* No. 96 Civ. 7345, 1997 U.S. Dist. LEXIS 1426, *18 (S.D.N.Y. Feb. 7, 1997) (finding customer list not a trade secret where one could obtain the names and addresses of customers in the

public domain or through well-known sources); *Ivy Mar Co. v. C.R. Seasons, Ltd.,* 907 F. Supp. 547, 557 (E.D.N.Y. 1995) (report and recommendation) *adopted by* 907 F. Supp. 547 (E.D.N.Y. 1995) (same); *Consol. Brands,* (same); *Atmospherics, Ltd. v. Hansen,* 269 A.D.2d 343 (N.Y. App. Div. 2000) (same); *Leo Silfen*, 328 N.Y.S.2d at 429-430 (same).

As the court expressed in *Webcraft*, and as related to the first, second, and sixth factors for consideration listed in *Ashland Management*, the Court must consider "whether the effort invested in developing the customers simply involved widespread canvassing, as was the case in *Leo Silfen*, or whether the employer actually worked to create a market for a new service or good." *Webcraft Technologies, Inc. v. McCaw*, 674 F. Supp. at 1045; *accord Leo Silfen*, 328 N.Y.S.2d at 429 ("Although plaintiffs have demonstrated an investment of time and money in developing a patronage . . . the investment was not an attempt to create a market for a new type of service. Rather, that investment reflected simply widespread canvassing of an obvious and highly competitive market."). Here, as stated above, the efforts to develop the customer contacts largely involved a widespread canvassing on the part of Taddeo. Furthermore, the product is not one that is so specialized that Iron Mountain actually created a new market; rather, the list of potential customers appears limitless. In short, the list of customer contact information was developed largely through the efforts of Taddeo both before and during his employment at Iron Mountain, in a market that is not highly specialized but has many, easily identifiable, potential customers. With respect to the April Bookings Report, specifically, the customers on that list are not even customers who purchased Data Products, the product that Taddeo will be exclusively selling at Media Recovery. As to both lists, it would not be too difficult for someone to duplicate the names by again canvassing the market through phone calls and general research.

Accordingly, for all the reasons stated above, the Court finds that Iron Mountain has failed to demonstrate a likelihood of success on the merits in showing that the April Bookings Report or the Outlook Contacts are entitled to trade secret protection.

### 3. PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON ITS FIDUCIARY BREACH OF DUTY CLAIMS

Iron Mountain argues that even if the customer list did not rise to the level of trade secret, Iron Mountain would still be entitled to injunctive relief based on Taddeo's breach of fiduciary duty while employed at Iron Mountain. *See Garvin GuyButler Corp. v. Cowen & Co.*, 588 N.Y.S.2d 56, 57 (Sup. Ct. N.Y. Co. 1992) ("[I]f there has been a physical taking or studied copying of confidential information, the court may in a proper case grant injunctive relief, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiff's service.") (citing *Leo Silfen*, 29 N.Y.2d 387.)

At oral argument, defendants themselves conceded that Iron Mountain would be likely to succeed on the merits of the breach of fiduciary duty claim. There is documentary evidence demonstrating that Taddeo diverted some orders and attempted to divert others from Iron Mountain to Media Recovery during his last two weeks of employment at Iron Mountain. Thus, the Court will need to address whether irreparable harm is likely to result from Taddeo's actions and whether Iron

Mountain can be made whole by monetary damages.

### E. BALANCE OF HARDSHIPS

As to the claims regarding the enforcement of the restrictive covenant and the alleged misappropriation of trade secrets, even assuming plaintiffs could show sufficiently serious questions going to the merits making them a fair ground for litigation, the Court finds that Iron Mountain cannot establish that the balance of hardships weighs decidedly in its favor.[10] *MyWebGrocer*, 375 F.3d at 192. Iron Mountain argues that, if an injunction is not issued, it would lose a competitive advantage and customer relationships. It further argues that the hardship will be comparably less to defendants because Taddeo and Media Recovery can continue to solicit new Data Products customers. However, Taddeo's compensation at Media Recovery is tied directly to his ability to solicit potential Data Products customers. If Taddeo was prohibited from soliciting any of the 1500 businesses listed in his Outlook Contacts, he would be considerably impeded from his ability to function as a salesman in his region. Furthermore, given the method the contacts were developed in the first instance, it would likely add considerable more work for Taddeo to allow him only to call potential customers not included on his Outlook Contacts because a majority of those contacts were initially developed through cold calls and research and it would practically require cross-checking customers every time a potential name came up to ensure they were not on the list. This would constitute a large hardship for Taddeo.

In addition, Iron Mountain is trying to de-emphasize its sales of Data Products, while the sale of Data Products is Taddeo's exclusive business. The purpose of the change in the 2006 Compensation Plan was to focus salesmen on the core services rather than Data Products, which are low-margin products. Accordingly, the Court finds that Iron Mountain cannot demonstrate that the balance of hardships weighs decidedly in its favor.

### F. IRREPARABLE HARM

Because Iron Mountain has not demonstrated a likelihood of success on the merits or a balance of hardship in its favor with respect to the 2004 Agreement or the misappropriation of trade secrets claim, the Court need not address the issue of irreparable harm as to those claims. However, because there is a likelihood of success on the merits with respect to the breach of fiduciary duty claims, the Court needs to examine whether there is irreparable harm in connection with such conduct if no injunctive relief is granted. As set forth below, the Court finds no irreparable harm as to those claims because the alleged injury can be compensated through monetary damages.

The irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam) (internal quotations omitted). "Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). In addition, the mere possibility of harm is not sufficient. *Id.* "A successful plaintiff must demonstrate that absent interim relief it will

---

[10] The Court need not address the breach of fiduciary duty claim under this prong because it has already found a likelihood of success on the merits.

suffer an injury that is neither remote nor speculative, but actual and imminent." *Consol. Brands Inc.*, 638 F. Supp. at 155.

The conduct that is the basis for Iron Mountain's breach of fiduciary duty claims occurred for the two weeks prior to May 4, 2006, and there is no indication that Taddeo diverted orders after that date. Accordingly, such conduct cannot be remedied by the grant of injunctive relief as it is not continuing conduct. In *Elpac Ltd v. Keenpac N. Am. Ltd. et al*, 588 N.Y.S.2d 667, 669 (3d Dep't 1992), the court reversed a grant of a preliminary injunction where employees had secretly formed a competitor business, improperly utilized their time and plaintiff's resources in furtherance of their new business, and diverted customer orders from plaintiff to their new company, all while under plaintiff's employment. The court in *Elpac* found that the products at issue, European-style shopping bags, were not "such that the individual defendants' wrongful diversion of one order would give defendants an unfair competitive edge in connection with subsequent orders from the same customer." *Id.* The Court finds that Data Products, similarly, are not such that a wrongful diversion of one order would give defendants a competitive edge on subsequent orders from the same customer. The record demonstrates that Data Products are one time, low margin sales, and each sale requires a new order from the customer. As the court found in *Elpac*, "[u]nder these circumstances, plaintiff has failed to demonstrate that it cannot be made whole by an award of monetary damages." *Id.*

Accordingly, the alleged breach of duty in the last two weeks while Taddeo was employed at Iron Mountain is not an egregious breach of trust and confidence that warrants injunctive relief. *See Canteen Vending Services v. Manufacturers and Traders Trust Co.*, No. 98-CV-0314E(SC), 1998 WL 268858, at *2 (W.D.N.Y. May 18, 1998). ("[W]here, as here, the former employee is not bound by a restrictive covenant and has not been shown to possess trade secrets, an allegation that the former employee breached his duty of loyalty while employed by his former employer does not, in and of itself, provide a basis for granting injunctive relief following termination of the employment relationship."). "Loss of business, if it is not remote or speculative but actual, is a quantifiable injury." *Consol. Brands, Inc.*, 638 F. Supp. at 155; *see also Westwood Chemical Co. v. Kulick*, 570 F. Supp. 1032, 1036-39 (S.D.N.Y. 1983) (calculating money damages for employee's breach of duty of loyalty). If Iron Mountain successfully demonstrates at trial that business was diverted, which it will likely do, then Iron Mountain's loss can be addressed by money damages. If a full trial on the merits results in a permanent injunction, any interim loss of business will also be quantifiable and compensable by money damages. *See id.*

### III. CONCLUSION

For the reasons stated above, Iron Mountain's request for a preliminary injunction is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 30, 2006
Central Islip, New York

\* \* \*

The attorneys for plaintiff are Andrew Todd Solomon, Esq. and Adam b. Oppenheim, Esq., Sullivan & Worcester LLP, 1290 Avenue of the Americas, 29th Floor, New York, New York 10104. The attorneys for defendants are R. Lance Witcher, Esq., Josef S. Glynias, Esq., and Randall S. Thompson, Esq., Blackwell Sanders Peper Martin LLP, 720 Olive Street, Suite 2400, Saint Louis, Missouri, 63101, and Peter Venaglia, Esq., Dornbush Schaeffer Strongin & Venaglia, 747 3rd Avenue, New York, New York 10017.